ACCEPTED
03-14-00709-CV
5172242
THIRD COURT OF APPEALS
AUSTIN, TEXAS
5/6/2015 11:42:47 AM
JEFFREY D. KYLE
CLERK

## NO. 03-14-00709-CV

**IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS
AUSTIN, TEXAS**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/6/2015 11:42:47 AM
JEFFREY D. KYLE
Clerk

**ENTERGY TEXAS, INC.**
**Appellants,**

**v.**

**PUBLIC UTILITY COMMISSION OF TEXAS**
**Appellee.**

*Appeal from the 53rd Judicial District Court, Travis County, Texas*
*The Honorable Amy Clark Meachum, Judge Presiding*

**APPELLEE TEXAS INDUSTRIAL ENERGY CONSUMERS'
ORAL ARGUMENT EXHIBITS**

**MAY 6, 2015**

> Rex D. VanMiddlesworth
> rex.vanmiddlesworth@tklaw.com
> State Bar No. 20449400
> Benjamin Hallmark
> benjamin.hallmark@tklaw.com
> State Bar No. 24069865
> **THOMPSON & KNIGHT LLP**
> 98 San Jacinto Blvd., Suite 1900
> Austin, TX 78701
> Telephone: (512) 469-6100
> Facsimile: (512) 469-6180
> **ATTORNEYS FOR APPELLEE TEXAS
> INDUSTRIAL ENERGY CONSUMERS**

# INDEX

ETI sought to define unrecovered costs as "lost revenues" at the PUC ...............1

Selected evidence before the PUC on the amount of unrecovered costs..............2

Costs to Serve a CGS Customer Under Revised CGS Program...........................5

Selected findings of fact from pages 10-16 of the PUC's Interim Order .............6

Excerpt from D. 38951 Interim Order .................................................................7

Comparison of ETI's reply brief quotations of the PUC's orders
to the actual orders ...........................................................................................8

i

**ETI sought to define unrecovered costs as "lost revenues" at the PUC**

The purpose of this Rider is to provide a mechanism for *recovery of such lost base rate revenues* that were included in the Company's last general rate case proceeding . . .

*Excerpt of ETI's proposed CGSUSC Rider in Docket No. 37744*[1]

*Unrecovered Costs should be defined* as the *embedded production costs and any other related base rate costs that would have been recovered through traditional rates* charged to CGS Customers that will no longer be recovered from the CGS Customers. *These are costs that the CGS Customers would have paid* under their traditional rate schedules if they had not switched to the CGS program.

*Excerpt of ETI witness Phillip May's February 2012 supplemental direct testimony*[2]

. . . ETI is *seeking recovery of* "unrecovered costs" which the Company has defined as its *embedded generation costs* . . .

*Excerpt of ETI witness J. Stephen Dingle's February 2012 supplemental rebuttal testimony*[3]

Q        . . . And *is it still the purpose of ETI* to provide a mechanism for *recovery of lost base rate revenues*.  Answer? Will you read your answer there?

A        (May) *Yes*, the tariff is intended to recover those costs that would go unrecovered as a result of this tariff.

*Hearing testimony of ETI witness Phillip May at April 2012 PUC hearing*[4]

**The PUC's conclusion of law on unrecovered costs:**

PURA § 39.452(b) does not allow for the recovery of *lost revenue or embedded generation costs*. [5]

**Excerpt of ETI's Motion for Rehearing at the PUC:**

As the ALJ determined and the evidence clearly demonstrates, *"the 'unrecovered costs'* referenced in PURA § 39.452(b) and the *'lost revenue'* that ETI has calculated as the measure of the unrecovered costs *are one and the same* in the ratesetting context." [6]

---

[1] AR Part II, Binder 3, ETI Ex. 9 (Direct Testimony of Phillip R. May at PRM-1 at p.5) (emphasis added).

[2] AR Part II, Binder 3, ETI Ex. 91 (Supplemental Direct Testimony of Phillip R. May at 5-6) (emphasis added).

[3] AR Part II, Binder 3, ETI Ex. 95 (Supplemental Rebuttal Testimony of J. Stephen Dingle at 12) (emphasis added).

[4] AR Part III, Binder 5, Vol. B (Tr. at 98, Apr. 19, 2012) (emphasis added).

[5] AR Part I, Binder 2, Item 119 (Final Order of the Public Utility Commission at CoL 2) (emphasis added).

[6] AR Part I, Binder 2, Item 121 (Motion for Rehearing of Entergy Texas Inc. at 4) (emphasis added).

**<u>Selected evidence before the PUC on the amount of unrecovered costs</u>**

*Excerpts from supplemental direct testimony of TIEC expert witness Jeffry Pollock*

**ETI's costs that could potentially be unrecovered as a result of the implementation of the contemplated CGS Program are the expenditures that ETI would incur to provide service to CGS Customers** once a CGS tariff is implemented. These expenditures include the start-up and on-going costs to develop and maintain the CGS Program and the cost of providing backup power to CGS Customers if CGS Supply becomes unavailable.

**CGS Customers should pay ETI's reasonable start-up and on-going program and implementation costs for the CGS Program. CGS Customers would also pay backup power costs** through a Fixed Cost Contribution Fee and the Unserved Energy Rate. **Consequently, no unrecovered costs would exist that need to be allocated to other customers and customer classes.**[1]

. . .

Q    WOULD ANY UNRECOVERED COSTS EXIST AFTER START-UP, ON-GOING AND BACKUP POWER COSTS ARE PAID BY THE CGS CUSTOMER?

A    No. Recall that, **under the CGS Program described in the Stipulation**, the CGS Customer would effectively buy its own capacity and energy from the CGS Supplier. With the exception of the capacity credit and fixed fuel factor, **a CGS Customer will pay ETI a retail rate that includes all other charges the customer would pay as a firm customer, including a transmission and distribution rate and all other applicable tariffs (e.g., Rider TTC, HRC, SRC, SCO, AFC and FF charges, if applicable). There would be no other unrecovered costs.**[2]

. . .

**With the proposed cap, the CGS Program would at most have the effect of slowing ETI's load growth, not reducing its load.** As load grows, each additional kW and kWh sold will provide a contribution to all fixed costs, including embedded generation capacity costs. Any reduction in embedded generation cost recovery that may be attributable to the CGS Program may be more than offset by the increased revenues resulting from load growth. Stated differently, **as long as ETI continues to collect the same amount of revenue or more as its embedded generation costs established for a test-year, it cannot claim that any costs are unrecovered,** irrespective of how it defines unrecovered costs. Instead, those costs are simply being recovered from new customers or through growth in the demand of existing customers.[3]

---

[1] AR Part II, Binder 4, TIEC Ex. 15 (Supplemental Direct Testimony and Exhibits of Jeffry Pollock at 8) (emphasis added).

[2] *Id.* at 16 (emphasis added).

[3] *Id.* at 21 (emphasis added).

*Excerpts from supplemental direct testimony of Cities expert witness Karl Nalepa*

**The current CGS program has been designed such that no production costs need go unrecovered.** The current CGS program is designed so that over the long term the CGS customer will pay for any production costs incurred by ETI on the CGS customer's behalf--either through the CGS rate and fixed cost contribution charge or through the unserved energy rate. Unlike the originally-proposed program which was designed to serve energy only, the CGS customer under the current proposal would contract for its own firm capacity and energy so would not be supplied either capacity or energy by ETI . . . .

**The Fixed Cost Contribution Fee, which should recover the fixed production costs incurred on behalf of LIPS CGS Customers,** is $1.10/kw/month based on costs established in Docket No. 37744. Should production costs change in the current base rate case, Docket No. 39896, the fixed production costs of the CGS customer would also change.[4]

*Excerpts from cross-examination of TIEC expert witness Jeffry Pollock at April 2012 hearing*

Q      Well, I take it from your testimony that you're saying **the only kind of unrecovered costs the company will experience are the costs of putting the program together and administering it?**

A      (Pollock) **Yes. Based on the parameters of the program that is now before the Commission** where capacity is basically -- potentially and hopefully would be treated as firm capacity, that would be the case.[5]

. . .

Q      And based on this exhibit, you conclude that they'll have enough -- **there will be enough load growth to offset any unrecovered costs.**

A      (Pollock) **Correct**.[6]

*Excerpt of examination of Cities expert witness Karl Nalepa at April 2012 hearing*

Q      Mr. Nalepa, Mr. Neinast was asking you whether Entergy would still serve the CGS customers, and I think he had an example of a customer -- a LIPS customer of a hundred megawatts, 80 megawatts stayed on LIPS and 20 megawatts moved to the CGS program. Can you kind of explain the difference between what he's saying -- or what I interpreted, I guess, as serving the customer and where the capacity would actually come from?

A      (Nalepa) Sure. The capacity agreement is between the CGS customer, and we'll call it the QF as a supplier, but physically the QF -- or Entergy would purchase energy from the QF and

---

[4] AR Part II, Binder 3, Citiex Ex. 6C (Supplemental Direct Testimony of Karl J. Nalepa at 10-11) (footnote omitted) (emphasis added).
[5] AR Part III, Binder 5, Vol. B ( Tr. at 166, Apr. 12, 2012) (emphasis added).
[6] *Id.* at 171 (emphasis added).

then -- at avoided cost.  Entergy would resell it to the CGS customer at avoided cost.  So they're still connected, but the supply is dedicated from a specific supplier to a specific customer.

*Q*      *So would ETI necessarily then be incurring production costs to serve the CGS customer?*

*A*      *(Nalepa) No, not at all.*[7]

---

[7] *Id*. at 196-97 (emphasis added).

**Costs to Serve a CGS Customer Under Revised CGS Program**
**[Demonstrative Exhibit]**

| Cost | Recovery Method | Who Pays | Cost to ETI | Finding of Fact[1] |
|------|-----------------|----------|-------------|--------------------|
| **Capacity** | CGS Supplier-Customer contract | CGS customer | $0 | FoF 41(A)(1), B(1), (C)(2) p. 18 |
| **Energy** | CGS Supplier charges ETI avoided cost under PUCT Rate Schedule LQF, which is passed through to the CGS customer | CGS customer | $0 | FoF 41(D)(1) p. 19 |
| **Backup power** | CGS customer pays ETI unserved energy charge at 105% of avoided cost + Fixed Cost Contribution Fee of $1.10 per kW/mo | CGS customer | $0 | FoF 41(E), (F) p. 19-20 |
| **Transmission and Distribution** | PUCT tariff | CGS customer | $0 | FoF 41(C)(3) p. 18 |
| **Other applicable rates (e.g., Rider TTC, HRC, SRC, SCO, AFC)** | Applicable PUCT tariff | CGS customer | $0 | FoF 41(C)(5) p. 19 |
| **Implementation Costs** | To-be-filed CGS Rider | CGS customer or LIPS customer | $0 | FoF 57(B) |
| **Administrative Costs** | To-be-filed CGS Rider | CGS customer or LIPS customer | $0 | FoF 57(B) |

---

[1] AR Part II, Binder 1, Item 119 (Final Order of the Public Utility Commission of Texas).

**Selected findings of fact from pages 10-16 of the PUC's Interim Order**[1]

25.     The parties agreed that there will be a 115 MW cap on the CGS program.

28.     The parties agreed that there will be a cap of 10 CGS purchase agreements.

29.     The parties, except ETI, agreed that to the extent there are costs unrecovered as a result of the implementation of a CGS tariff, those costs should be borne solely by customers taking service under the CGS tariff, i.e., CGS customers.  ETI did not oppose this stipulation.

30.E.   CGS customer fixed-cost contribution

1. The level of compensation to ETI from CGS customers for CGS service will include a monthly fixed charge called a fixed-cost contribution.
2. The fixed-cost contribution will be $1.10 per kW of CGS load per month.
3. Revenues from the fixed-cost contribution will reduce any otherwise unrecovered costs associated with the program.

30.F.2 The structure of the CGS unserved energy tariffed rate will include an agreed energy charge and agreed O&M adder.

32.     The parties stipulated that based on an assessment of load requirements and generating capability, the [Strategic Resource Plan] projects that ETI has an incremental net resource deficiency of 260 MW in 2012 and 504 MW in 2013.

34.     The parties stipulated that CGS purchase agreements are resources that will be included in the Entergy System's portfolio of supply resources, consistent with the terms and conditions related to the delivery requirements of those purchase agreements (*e.g.*, degree of dispatchability, term, degree of firmness).

38.     PURA § 39.452(b) provides for the utility to be able to recover any costs unrecovered as a result of the implementation of the tariff.

**40.     The Commission finds that the costs that will be unrecovered as a result of the implementation of the CGS program tariff are the costs to implement and administer the CGS program tariff.**  (emphasis added)

---

[1] AR Part I, Binder I, Item 77 (Interim Order of the Public Utility Commission).

ETI argued that unrecovered costs should be defined as the embedded production costs and any other related base rate costs that would have been recovered through traditional rates charged to CGS customers that will no longer be recovered due to the CGS program.[14] TIEC took the position that unrecovered costs should not include ETI's hypothetical lost revenues and that the costs that could be unrecovered as a result of implementation of the tariff should include the expenditures actually incurred by ETI to implement and maintain the CGS program.[15] Cities and OPUC agreed with TIEC that unrecovered costs are not the same thing as unrecovered revenues.[16] Cities also noted that it would be unreasonable to allow ETI to continue to incur costs for a customer the utility no longer plans to serve.[17]

In making its determination of the definition of unrecovered costs, the Commission follows the precedent set in *CenterPoint Energy Houston Electric, LLC v. Pub. Util. Comm'n*, 354 S.W.3d 899 (Tex. App—Austin, 2011 no pet.) where the Third Court of Appeals found that because the language of PURA § 39.905 did not specifically provide for recovery of "lost revenues" and that in at least two other provisions of PURA[18] the legislature expressly distinguishes "costs" from "revenues," the term "costs," as used by the legislature in PURA § 39.905, is not intended to include lost revenues.[19] Like PURA § 39.905, PURA § 39.452(b) only provides for "costs unrecovered as a result of implementation of the tariff" and does not specifically provide for the utility to recover lost revenues or any other type of costs.

Based on the evidence and testimony, the Commission finds that the proper interpretation of "costs unrecovered as a result of implementation of the CGS program tariff" is costs to implement and administer the CGS program tariff. Such unrecovered costs do not include lost revenues, embedded generation costs, or any other types of costs. The Commission reverses the proposal for decision on this issue.

---

[14] Supplemental Direct Testimony, Exhibits, and Workpapers of Phillip R. May, ETI Ex. 91 at 6.

[15] Supplemental Direct Testimony of Jeffry Pollock, TIEC Ex. 15 at 14-15.

[16] Supplemental Direct Testimony of Karl Nalepa, Cities Ex. 6C at 7 and Supplemental Cross Rebuttal Testimony of Clarence Johnson, OPUC Ex. 8 at 6.

[17] Supplemental Direct Testimony of Karl Nalepa, Cities Ex. 6C at 7-8.

[18] PURA § 55.024(b) and PURA § 56.025(e).

[19] *CenterPoint Energy Houston Electric, LLC v. Pub. Util. Comm'n*, 354 S.W.3d 899, 903-904 (Tex.Civ.App—Austin, 2011)

7

**Comparison of ETI's reply brief quotations of the PUC's orders to the actual orders**

The PUC's Interim Order (p. 6):

Based on the evidence and testimony, the Commission finds that the proper interpretation of "costs unrecovered as a result of implementation of the CGS program tariff" is costs to implement and administer the CGS program tariff. Such unrecovered costs do not include lost revenues, embedded generation costs, or any other types of costs. The Commission reverses the proposal for decision on this issue.

ETI's quotation of the foregoing in its reply brief (p. 5) (emphasis ETI's):

[T]he proper *interpretation* of "costs unrecovered as a result of implementation of the CGS program tariff" is costs to implement and administer the CGS program tariff. Such unrecovered costs do not include lost revenues, embedded generation costs, or any other types of costs. The Commission reverses the proposal for decision on this issue.

---

The PUC's Final Order at finding of fact 20:

The Commission held the hearing on the merits on April 19, 2012, and issued an interim order on June 12, 2012 that adopted the unopposed issues and ruled that the types of costs that will be considered ETI's unrecovered costs for purposes of PURA § 39.452(b) are those costs necessary to implement and administer the CGS program and are not to be defined to include lost revenues, embedded generation costs, or any other types of costs.

ETI's quotation of the foregoing in its reply brief at 6 (emphasis ETI's):

the *types* of costs that will be *considered* ETI's unrecovered costs *for purposes of PURA § 39.452(b)* are those costs necessary to implement and administer the CGS program and are not to be *defined* to include lost revenues, embedded generation costs, or any other types of costs.

---

The PUC's finding of fact on unrecovered costs (FoF 40 in Interim Order and FoF 51 in Final Order):

The Commission finds that the costs that will be unrecovered as a result of the implementation of the CGS program tariff are the costs to implement and administer the CGS program tariff.

ETI's reply brief:

[This finding of fact is not quoted in ETI's reply brief or appellant's brief.]

**CERTIFICATE OF SERVICE**

As required by Texas Rule of Appellate Procedure 9.5, I certify that on the 6th day of May, 2015, the foregoing document was electronically filed with the Clerk of the Court using the electronic case filing system of the Court, and that a true and correct copy was served on the following lead counsel for all parties listed below via electronic service:

| | |
|---|---|
| *Counsel for Entergy Texas, Inc.* | John F. Williams<br>Marnie A. McCormick<br>Duggins Wren Mann & Romero, LLP<br>600 Congress Ave., Ste. 1900<br>Austin, Texas 78701 |
| *Counsel for the Public Utility Commission of Texas* | Elizabeth R. B. Sterling<br>Megan M. Neal<br>Environmental Protection Division<br>Office of the Attorney General<br>P.O. Box 12548<br>Austin, Texas 78711-2548 |
| *Counsel for Office of Public Utility Counsel* | Sara J. Ferris<br>Office of Public Utility Counsel<br>1701 N. Congress Ave., Ste. 9-180<br>P.O. Box 12397<br>Austin, Texas 78711-2397 |

*/s/ Benjamin Hallmark*